FILED
Court of Indian Offenses
Southern Plains Region

JAN 19 2021

By:_____
Court Clerk/Deputy

IN THE COURT OF INDIAN OFFENSES
FOR THE APACHE TRIBE OF OKLAHOMA

FSS DEVELOPMENT CO., LLC, a )
Delaware limited liability company, )
 )
    Plaintiff, )
 )
v. ) Case No. CIV-21-030
 )
(1) APACHE TRIBE OF OKLAHOMA, )
a federally recognized Indian tribe, and )
(2) APACHE BUSINESS COMMITTEE, )
An arm of the APACHE TRIBE OF )
OKLAHOMA, a federally recognized )
Indian tribe, )
 )
    Defendants. )

## COMPLAINT

Plaintiff, FSS DEVELOPMENT, COMPANY, L.L.C. ("FSS"), by and through its counsel, and for its Complaint for declaratory relief against the Defendants, the APACHE TRIBE OF OKLAHOMA, a federally recognized Indian Tribe, and the APACHE BUSINESS COMMITTEE, an arm of the Apache Tribe of Oklahoma, (collectively, the "Defendants"), alleges and states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff FSS is a Delaware limited liability company with its principal place of business in the State of Ohio. Plaintiff's sole member is Paul Filzer, an individual currently residing in Stow, Ohio.

2. The Apache Tribe of Oklahoma is a federally recognized Indian Tribe (the "Tribe"), with its headquarters in Anadarko, Caddo County, State of Oklahoma. Upon information and belief, the Tribe is organized pursuant to the Thomas-Rogers Oklahoma Indian Welfare Act, and has a Constitution approved by the United States Secretary of

**EXHIBIT 1**

Interior, which states that the supreme governing body of the Tribe shall be the tribal council consisting of all members of the Tribe eighteen (18) years of age and older.

3. The Apache Business Committee ("ABC") is an arm of the Apache Tribe with its principal place of business in Caddo County, State of Oklahoma. Upon information and belief, the ABC has the power to transact business and otherwise speak or act on behalf of the Tribe in all matters on which the Tribe is empowered to act pursuant to Article V of the Tribal Constitution.

4. This Court possesses jurisdiction over this controversy. 25 C.F.R. § 11.116(a)(2). This Court serves as the Court of the Apache Tribe of Oklahoma. 25 C.F.R. § 11.100(b)(1).

## STATEMENT OF FACTS

5. On December 4, 2010, a Special General Council meeting of the Apache Tribe's General Council was convened to consider the development of a Class II and Class III gaming facility (the "Gaming Facility") on Indian lands near the Oklahoma/Texas border called the Red River Project (the "Red River Project").

6. The Special General Council adopted a motion "to approve the [ABC] to move forward on the Red River Project in negotiations with an investor and the Stimulus Package to include the Contract Signing that is in the best interest of the Apache Tribe of Oklahoma." The Special General Council authorized the ABC to take certain actions consistent with this directive.

7. The ABC determined that FSS should be engaged as developer of the Red River Project to assist the Tribe to obtain financing for the design, development, construction and initial equipping of the Gaming Facility, and to furnish technical

experience and expertise related to these activities, and negotiated a Development Agreement conferring upon FSS the right to develop the Red River Project with the Tribe.

8. On December 20, 2010, FSS and the Tribe executed a Development Agreement Between The Apache Tribe of Oklahoma and FSS Development Company, L.L.C. (the "Development Agreement"), a true and correct copy of which is attached as Exhibit 1.

9. The Development Agreement states that it "shall be entered into and remain in full force and effect from the Execution Date through the eighty-three (83) month anniversary of the Commencement Date, unless terminated earlier pursuant to the terms [of the Agreement]." *Id.* at p. 17, Section 6.1.

10. Also on December 20, 2010, the Tribe executed a Promissory Note (the "Note"), pursuant to which it promised to pay to FSS (or its successors or assigns), the principal sum of Two Million, Two Hundred Thousand and No/100 Dollars ($2,200,000.00). A true and correct copy of the Promissory Note is attached as Exhibit 2.

11. The Promissory Note states that it will mature upon the first to occur of: (i) the first disbursement under the construction loan to be entered into pursuant to Section 7 of the Development Agreement, or (ii) the termination or expiration of the Development Agreement.

12. By Resolution No. 12-20-2010-1, the ABC authorized Louis Maynahonah, Chairman, to execute the Development Agreement consistent with the directive issued to the ABC by the Apache Tribe General Council at a Special General Council held on December 4, 2010. *See* Exhibit 3.

13. Under Section 1.2 of the Development Agreement, the objective of the Tribe and FSS in entering into and performing the Development Agreement is stated as follows:

> [T]o provide a legally enforceable procedure and agreement pursuant to which [FSS] will pay certain fees to the Tribe and will make certain loans to the Tribe, and whereby the Tribe and [FSS] can proceed as far as reasonably possible with the development of the Gaming Facility prior to the satisfaction of all Legal Requirements so that the Gaming Facility can be opened to the public as soon as possible after the satisfaction of all Legal Requirement[s]; and to set forth the rights and obligations of the parties if satisfaction of all Legal Requirements do not occur...

Exhibit 1, Development Agreement at p. 9, Section 1.2.

14. The Development Agreement also requires FSS to make an Interim Loan of $2,200,000 to the Tribe to cover certain Reimbursable Project Costs, as defined in the Development Agreement. *Id.* at p. 11, Section 2.1; *see also id.* at p. 20, Section 1.8.2 (defining Reimbursable Project Costs).

15. Under the Development Agreement, FSS is entitled to receive a Construction Management Fee in an amount equal to four percent (4%) of the total amount of the Construction and Development Costs (exclusive of the Construction Management Fee). *Id.* at p. 19, Section 8.1.

16. In addition, for and in consideration of the development obligations assumed by FSS under the Development Agreement, FSS was also entitled to receive a Developers Fee equal to twelve percent (12%) of the Net Win, defined as the amounts wagered on Class II and Class III electronic gaming devices less prizes paid out, less amounts charged for progressive jackpots. *Id.* at p. 8 and p. 19, Section 8.2.

17. During the term of the Development Agreement, or any extension thereof, FSS shall have an exclusive relationship with the Tribe regarding the design, development, construction and initial equipping of the Gaming Facility. *Id.* at p. 20, Section 9.1.

18. During the term of the Development Agreement, FSS "agrees not to develop, operate or manage any gaming and/or hotel/resort facilities within 75 miles of the Gaming Facility without the written consent of the Tribe," and the Tribe "agrees to not engage the services of any other developer with respect to the Gaming Facility and not to engage in any other gaming development projects except the Gaming Facility, within 75 miles of the Property." *Id.* at p. 20, Section 9.2.

19. The Tribe made the following representations, warranties and covenants to FSS as part of the Development Agreement:

> **Section 10.1. <u>Representations and Warranties of the Tribe</u>.** The Tribe represents and warrants to Developer as follows:
>
> (i) The Tribe's execution, delivery and performance of this Agreement, the Interim Promissory Note and all other instruments and agreements executed in connection with this Agreement have been properly authorized by the Tribe and do not require further tribal approval.
>
> (ii) This Agreement and the Interim Promissory Note, subject to satisfaction of all Legal Requirements, have been properly executed, and once approved in accordance with [sic] Legal Requirements constitute the Tribe's legal, valid and binding obligations, enforceable against the Tribe in accordance with their terms.
>
> \*\*\*
>
> (iv) That the Tribe shall not shall not act in any way whatsoever, directly or indirectly, to cause [the Development Agreement] to be amended, modified, canceled, or terminated, except

>pursuant to its express terms, and shall take all actions necessary to ensure that [the] Agreement shall remain in full force and effect at all times.
>
>**Section 10.2. <u>Covenants by the Tribe</u>**. The Tribe covenants and agrees as follows:
>
> ***
>
>(iii) ...Neither the [ABC] nor any committee, agency, board or other official body, and no officer or official of the Tribe shall, by exercise of the police power or otherwise, act to modify, amend, or in any manner impair the obligations of contracts entered into by the [ABC] or other parties in furtherance of the financing, development, construction, operation, or promotion of Gaming on the Property without the written consent of the non-tribal parties to such contracts. Any such action or attempted action shall be void *ab initio, and* shall constitute an Event of Default hereunder. ...
>
>(iv) That the Tribe will waive sovereign immunity on the limited basis described in Article 13 with respect to this Agreement, the Interim Promissory Note, and any and all documents, contracts, instruments and security interests arising under any of the foregoing.
>
>(v) That this Agreement, the Interim Promissory Note, and any and all documents, contracts, instruments and security interests arising under any of the foregoing shall be specifically enforceable in accordance with their terms.
>
> ***

*Id.* at pp. 20-22, Sections 10.1 and 10.2.

20. Events of Default, as defined by the Development Agreement, include any circumstance in which a material representation or warranty made by the Tribe as part of the Development Agreement "shall prove to have been untrue when made, or is later untrue without notice to [FSS] of the change in status and written acceptance by [FSS] of the changed status." *Id.* at p. 23, Section 11.1(v).

21. Section 13.1.7 of the Development Agreement contains a limited waiver of the Tribe's sovereign immunity, which states as follows:

> **Section 13.1.7. Enforcement.** The Tribe expressly waives sovereign immunity from a judgment or order consistent with the terms and provisions of this Section 13.1.7 which is final because either the time for appeal thereof has expired or the judgment or an order is issued by a court having final appellate jurisdiction over the matter. The Tribe waives its sovereign immunity in, and consents to the jurisdiction of, to be sued in and to accept and be bound by any order or judgment of the United States District Court for the Western District of Oklahoma, and any federal court having appellate jurisdiction thereover, consistent with the terms and provisions of this Section ...

*Id.* at p. 31, Section 13.1.7.

22. In addition, Section 13.1.8 of the Development Agreement provides FSS with certain rights and remedies in the event of any threatened or purported revocation or limitation of the waiver of its sovereign immunity as described in the Development Agreement:

> **Section 13.1.8. Guaranty of Tribe.** The Tribe agrees that it will not revoke or limit, in whole or in part, the Tribe's limited waiver of sovereign immunity contained in this Section. In the event of any such revocation or attempted revocation, the Parties expressly recognize and agree that there remains no adequate remedy at law available to [FSS], and Tribe hereby consents to and will not oppose the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement, against the Tribe, and/or any other instrumentality of the Tribe which may be necessary to give effect to the waiver of tribal sovereign immunity contained in this Section 13.1. In the event of any attempted limitation or revocation of the limited waiver of sovereign immunity granted herein, [FSS] may immediately seek judicial injunctive relief as provided in this Section without first complying with any of the prerequisites contained in this Section to the limited waiver of sovereign immunity granted herein. Any action seeking injunctive relief under this Section 13.1.8 shall be brought in the Courts consistent with Section 13.1.7, and the Tribe expressly consents to the jurisdiction of, and agrees to be bound by any order or judgment of such Court, and any federal Court with appellate jurisdiction thereover.

*Id.* at p. 32, Section 13.1.8.

23. Under Section 14.6, the Tribe agrees to "execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent thereof." *Id.* at p. 35, Section 14.6.

24. FSS has substantially complied with all of the obligations and duties imposed upon it as developer under the Development Agreement, including the funding of the Interim Loan described in Section 2.1. FSS has dedicated a significant amount of time, money and resources to its development efforts pursuant to the Development Agreement.

25. FSS has engaged third party firms to conduct an environmental study and market feasibility studies as part of its efforts to develop the Red River Project. These include studies of the economic climate of the region, analysis of the potential market support for the Red River Project, and estimated utilization and projections of cash flow from operations for the project for the first five years of operation.

26. FSS has dedicated a substantial amount of time and resources to assisting the Tribe in resolving certain title and heirship issues impacting the availability of the land intended to be used for the Red River Project. These efforts were hampered by the ABC's failure to timely comply with its promises to assist and cooperate in obtaining necessary signatures for certain instruments needed for the resolution of these issues.

27. The Tribe also failed to submit a least to the Bureau of Indian Affairs pursuant to which the Tribe or an agency or instrumentality of the Tribe will lease the Kosope Allotment designated for the construction of the Project. The Tribe has also

failed to take the actions necessary to ensure that the Bureau of Indian Affairs approves the required Lease once it is submitted.

28. FSS has obtained two separate bona fide financing term sheets from outside institutional investors offering to fund the construction and development costs of the Red River Project, both of which were delivered to the Tribe for review and consideration. However, the Tribe simply ignored these term sheets and refused to communicate and cooperate with Developer in securing the necessary financing.

29. FSS's efforts to move the Red River Project into the construction phase has been consistently hampered by the ABC, specifically due to periodic changes in the individual members of the ABC. The ABC has repeatedly failed to comply with its obligations under the Development Agreement and to satisfy the promises and agreements made with FSS pursuant thereto, and these failures have caused the Red River Project to encounter numerous obstacles in the development of the project. Nonetheless, FSS has made every diligent effort to address and resolve these issues as they arise, and continues to do all actions in its power to fulfill the obligations of the Development Agreement and to progress the Red River Project into the construction phase.

30. On October 4, 2016, FSS received a letter from Padraic McCoy, purportedly as an authorized agent of the Tribe, which claims that the Development Agreement is invalid and unenforceable, or in the alternative, purporting to provide notice of default per Article 11 of the Development Agreement. *See* Exhibit 4.

31. Upon information and belief, prior to preparing this October 4th letter, Mr. McCoy had a pre-existing relationship with Defendant Julian and his consulting clients,

Tom Wilmont and Wilmorite Management Group LLC ("Wilmorite"), and has represented Julian, Wilmont and/or Wilmorite in discussions and negotiations with the Tribe relating to Wilmorite's efforts to assist the Tribe in the development of gaming facilities at Red River and other locations. Mr. McCoy was introduced to the Tribe through Julian, Wilmont and Wilmorite, and Defendant Julian and the individual members of the ABC named as Defendants herein have conspired with Mr. McCoy to terminate or breach the Development Agreement with FSS in order to facilitate Wilmorite's involvement as developer of these gaming facilities.

32. Upon information and belief, Mr. McCoy was hired by the Tribe at the suggestion of Julian and the individual members of the ABC named as Defendants herein, and the October 4th letter was prepared at the request of Julian and the individual members of the ABC named as Defendants herein, and subject to their joint directions and control.

33. Further, upon information and belief, Julian and the individual members of the ABC named as Defendants herein have been working with Mr. McCoy and others in an effort to convince other members of the ABC and/or other Tribal members that the FSS Development Agreement is invalid and unenforceable so that Defendant Komardley can pursue contractual agreements with Julian and his clients, Wilmont and Wilmorite, and other third parties regarding the development of the Red River Project.

34. Upon information and belief, subsequent to sending the letter referenced in paragraph 37 above, Mr. McCoy, working on behalf of Defendant Julian and his consulting clients, Wilmont and Wilmorite, prepared a "Joint Venture Agreement" (JVA)

between the Tribe and Wilmorite naming Wilmorite or one of its affiliated development entities as the developer for the Red River gaming facility.

35. Upon information and belief, Mr. McCoy also prepared, on behalf of Defendant Julian and his consulting clients, Wilmont and Wilmorite, a "Joint Venture Agreement" (JVA) between the Tribe and Wilmorite naming Wilmorite or one of its affiliated development entities as the developer for a gaming facility known as Medicine Park. The proposed location of the Medicine Park facility is located within 75 miles of the Red River project and any agreement signed by the Tribe to develop a gaming facility at this location would be in violation of Section 9.2 of the Development Agreement with FSS.

36. Upon information and belief, the Tribe and the ABC have proposed, and have passed, resolutions at its annual general council meeting on June 17, 2017 that would rescind the 2010 Resolution authorizing execution of the Development Agreement with FSS and/or would authorize the ABC to enter into contractual relationships with Wilmont/Wilmorite and/or an unknown third party for the development of the Red River Project and the Medicine Park project. Upon information and belief, the Tribe has already entered into such a Joint Venture Agreement with at least one third party, such Joint Venture Agreement constituting a breach of the Development Agreement.

37. The proposal to rescind the 2010 Resolution authorizing execution of the Development Agreement and/or authorizing the ABC to enter into alternative contractual relationships inconsistent with the terms of the Development Agreement would be in direct breach of the contractual agreements, representations, warranties and covenants made by the Tribe in the Development Agreement.

38. On October 25, 2016, FSS wrote a letter notifying the ABC and the Tribe of an Event of Default under the Development Agreement caused by the Tribe's failure to take the necessary actions to ensure that the Lease of the Kosope Allotment is property prepared for review and approval by the Bureau of Indian Affairs, and the Tribe's failure to make any response to the financing term sheets obtained by Developer and submitted to the Tribe for consideration. *See* Exhibit 5.

39. Upon information and belief, Defendants Julian and the individual members of the ABC named as Defendants herein have had communications with various third parties in which the Defendants have falsely alleged, at various times, that the Tribe is not a party to any existing agreement regarding the development of the Red River Project, and have also falsely alleged, at various times, that the FSS Development Agreement is invalid and/or unenforceable and/or has been terminated by the Tribe and/or has been breached by FSS.

40. These communications include discussions with marketing and financing consultants, gaming machine vendors, architectural and engineering consultants, environmental consultants, and others. Upon information and belief, Defendants Julian and the individual members of the ABC named as Defendants herein have also engaged in discussions with the Bureau of Indian Affairs regarding approval of the land lease(s) necessary for Wilmont/Wilmorite's development of the Red River and Medicine Park projects.

41. These communications were made for the purpose of, and have had the result of, obstructing FSS's efforts to perform under the Development Agreement and/or for the purpose of arranging relationships with vendors, suppliers and consultants to

assist Julian and Wilmont/Wilmorite in the initial stages of developing a gaming facility thereby further obstructing FSS's efforts to perform under the Development Agreement.

## COUNT I: DECLARATORY JUDGMENT

42. Plaintiff incorporates by reference the facts pleaded in paragraphs 1-41 herein.

43. FSS contends (i) that the Development Agreement is a valid and enforceable contract duly approved and executed and approved by the then-acting Chairperson of the ABC, and pursuant to the valid authority granted to such Chairperson by and pursuant to the resolutions passed by the ABC and the general council of the Apache Tribe; (ii) FSS is not in default of any term of the Development Agreement and has substantially complied with all material duties and obligations imposed upon FSS under the Development Agreement; (iii) that the Development Agreement may not be rescinded, in whole or in part, except in accordance with its terms, (iv) that the Tribe and the ABC are contractually prohibited by the Development Agreement from taking any action "directly or indirectly, to cause [the Development Agreement] to be amended, modified, canceled, or terminated, except pursuant to its express terms"; and (v) that the Tribe and the ABC are contractually required to "take all actions necessary to ensure that [the] Agreement shall remain in full force and effect at all times."

44. Upon information and belief, the Tribe, the ABC, and/or one or more of the individual members serving on the ABC claim that the Development Agreement is invalid and unenforceable and/or that FSS is in default of the Development Agreement.

45. An actual controversy exists between FSS, on the one hand, and the Tribe, the ABC, and the individual members serving on the ABC and named as party-

defendants herein, on the other hand, as to (i) whether the Development Agreement is a valid and enforceable contract under tribal and federal law duly approved and executed and approved by the then-acting Chairperson of the ABC, and pursuant to the valid authority granted to such Chairperson by and pursuant to the resolutions passed by the ABC and the general council of the Apache Tribe; (ii) whether the limited waiver of sovereign immunity contained within the Development Agreement is valid and effective and executed in accordance with the Apache Tribe Constitution; (iii) whether FSS is in default of any term of the Development Agreement and/or whether FSS has substantially complied with all material duties and obligations imposed upon FSS under the Development Agreement; (iv) whether the Development Agreement may be rescinded, in whole or in part, except in accordance with its terms, (v) whether the Tribe and the ABC are contractually prohibited by the Development Agreement from taking any action "directly or indirectly, to cause [the Development Agreement] to be amended, modified, canceled, or terminated, except pursuant to its express terms"; and (vi) whether the Tribe and the ABC are contractually required to "take all actions necessary to ensure that [the] Agreement shall remain in full force and effect at all times."

46.     FSS is entitled to a declaratory judgment finding as follows: (i) that the Development Agreement is a valid and enforceable contract under tribal and federal law duly approved and executed and approved by the then-acting Chairperson of the ABC, and pursuant to the valid authority granted to such Chairperson by and pursuant to the resolutions passed by the ABC and the general council of the Apache Tribe; (ii) that the limited waiver of sovereign immunity contained within the Development Agreement is valid and effective and executed in accordance with the Apache Tribe Constitution; (iii)

that FSS is not in default of any term of the Development Agreement and has substantially complied with all material duties and obligations imposed upon FSS under the Development Agreement; (iv) that the Development Agreement may not be rescinded, in whole or in part, except in accordance with its terms, (v) that the Tribe and the ABC are contractually prohibited by the Development Agreement from taking any action "directly or indirectly, to cause [the Development Agreement] to be amended, modified, canceled, or terminated, except pursuant to its express terms"; (vi) that the Tribe and the ABC are contractually required to "take all actions necessary to ensure that [the] Agreement shall remain in full force and effect at all times."

47. Further, to the extent that the Tribe, the ABC, or any other committee, agency, board or other official body of the Tribe has taken any action to modify, amend, or in any manner impair the obligations of the Tribe or FSS under the Development Agreement and Interim Promissory Note and/or any other contract or agreement associated with the Development Agreement or Interim Promissory Note and related to the financing, development, construction, operation, or promotion of Gaming on the Property without the written consent of the non-tribal parties to such contracts, FSS is further entitled to declaratory relief finding that such action is void *ab initio* and constitutes an Event of Default under the Development Agreement.

WHEREFORE, premises considered, Plaintiff, FSS Development Company, L.L.C., respectfully requests that this court enter judgment against the Defendants, jointly and severally, as follows:

A. For declaratory judgment finding as follows:

(i) that the Development Agreement is valid and enforceable contract under tribal and federal law duly approved and executed approved by the then-acting Chairperson of the ABC, and pursuant to the valid authority granted to such Chairperson by and pursuant to the resolutions passed by the ABC and the general council of the Apache Tribe;

(ii) that the limited waiver of sovereign immunity contained within the Development Agreement is valid and effective and executed in accordance with the Apache Tribe Constitution;

(iii) that FSS is not in default of any term of the Development Agreement and has substantially complied with all material duties and obligations imposed upon FSS under the Development Agreement;

(iv) that the Development Agreement may not be rescinded, in whole or in part, except in accordance with its terms,

(v) that the Tribe and the ABC are contractually prohibited the Development Agreement from taking any action "directly or indirectly, to cause [the Development Agreement] to be amended, modified, canceled, or terminated, except pursuant to its express terms";

(vi) that the Tribe and the ABC are contractually required to "take all actions necessary to ensure that [the] Agreement shall remain in full force and effect at all times"; and

(vii) to the extent that the Tribe, the ABC, or any other committee, agency, board or other official body of the Tribe has taken any action to modify, amend, or in any manner impair the obligations of the Tribe or FSS under the Development Agreement and Interim Promissory Note and/or any other contract or agreement associated with the Development Agreement or Interim Promissory Note and related to the financing, development, construction, operation, or promotion of Gaming on the Property without the written consent of the non-tribal parties to such contracts, such action is void *ab initio* and constitutes an Event of Default under the Development Agreement; and

B. For costs and attorney fees;

C. For such other relief to which the Court determines Plaintiff is entitled.

Respectfully Submitted,

s/ Ryland L. Rivas
Ryland L. Rivas, OBA # 7408
RIVAS LAW OFFICE
628 W. Choctaw Ave.
Chickasha, OK 73018
(405) 222-3500 | (405) 222-2296
ryland@rivaslawoffice.com

s/ Matthew W. Brockman
Matthew W. Brockman, OBA # 22077
HARTZOG CONGER CASON
201 Robert S. Kerr Avenue, Suite 1600
Oklahoma City, OK 73102
(405) 235-7000 | (405) 996-3403 (fax)
mbrockman@hartzoglaw.com

**ATTORNEYS FOR PLAINTIFF
FSS DEVELOPMENT COMPANY, L.L.C.**

**ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED**